## GEORGE MATTINGLY
### v.
## CHRISTIAN OBLEY.

HUSBAND AND WIFE—WIFE'S SEPARATE PROPERTY.—The evidence shows that the property claimed by the wife as her separate property, belonged to her husband; and the claim set up by her was an after-thought, asserted for the purpose of defeating the creditors of the husband. The transaction, if it discloses any interest on the part of the wife, shows nothing more than a loan of her money to the husband for the purpose of carrying on business.

APPEAL from the Circuit Court of Carroll county; the Hon. WILLIAM BROWN, Judge, presiding.

Messrs. ARMOUR & SHAW, for appellant; that it will be presumed, in the absence of proof, that the common law was in force in Pennsylvania at the time the wife received money from her father's estate, and that it became the property of her husband, cited Tinkler v. Cox, 68 Ill. 119; Dubois v. Jackson, 49 Ill. 49; Farrell v. Patterson, 43 Ill. 52.

The presumption of law is, that the husband is the owner of all the property in the wife's possession, if they are living together: Farrell v. Patterson, 43 Ill. 52; Brownell v. Dixon, 37 Ill. 167; Kahn v. Wood, 82 Ill. 219; Reeves v. Webster, 71 Ill. 307; Hackett et al. v. Bartley, 10 Chicago Legal News, 135; Stanton v. Kirch, 6 Wis. 338; Mazonk v. I. N. R. R. Co. 31 Iowa, 559; Rev. Stat. 1874, 577.

Where the verdict is against the law, or against the weight of evidence, a new trial should be granted: Higgins v. Lee, 16 Ill. 500; Schwab v. Gingerick, 13 Ill. 698; Clement v. Bashway et al. 25 Ill. 200; Ray v. Bulloch, 46 Ill. 65; I. C. R. R. Co. v. Chambers, 71 Ill. 519.

Messrs. HUNTER & SMITH, for appellee; argued that a husband may act as agent for his wife in the control and management of her separate property, and cited Brownell v. Dixon, 37 Ill. 167; Wortman v. Price, 47 Ill. 22; Sweeney et ux. v. Dawson et al. 47 Ill. 450; Dean v. Bailey, 50 Ill. 481; Dyer v.

Mattingly v. Obley.

Keefer, 51 Ill. 525; McLowrie v. Partlow, 53 Ill. 340; Haines v. Haines, 54 Ill. 74; Bridgford v. Riddell, 55 Ill. 261

SIBLEY, P. J.   The appellant in this case had, in October, 1877, levied several writs of attachment upon articles of personal property, described as one lumber wagon, one grain seeder, one fanning mill, three milch cows, two spring calves, one sucking colt, two corn plows, one drag, twenty-five shoats, three sows, seventeen pigs, six tons of hay, one hundred and twenty-five bushels oats, one McCormick reaper and mower, and one pair of bob-sleds, as the property of Frederick Shoaf, the defendant in the writs, which Obley, the appellee, soon afterwards replevied, claiming the same by virtue of a mortgage executed by Christine Shoaf, the wife of Frederick.

The principle question raised upon the trial was whether the property in dispute belonged to the wife, and, therefore, not liable to be seized by the constable upon the writs of attachments in favor of the husband's' creditors.

After a very careful examination of the testimony in the case, the only conclusion to be arrived at, is that the verdict of the jury finding the issues in favor of the mortgagee is manifestly against the evidence.   There are some minor points of error urged for reversing the judgment of the court below, which would probably justify a technical reversal, but we do not desire to place our decision upon that ground.   While transactions very similar to the one detailed in this record are so constantly recurring, it is better for the community, and more satisfactory to the parties in interest, that the questions arising should be squarely met, and unhesitatingly decided upon the merits of the case.

That this claim of ownership set up by Mrs. Shoaf was an after-thought, never occurring to her until the seizure had been made by the officer on behalf of the creditors of Mrs. Shoaf, is too palpable to admit of any serious question.   Take her own testimony, that she got money from her father, and gave it to her husband, while living in Pennsylvania, to buy land.   That he afterwards sold the land and bought lots, which they ultimately disposed of; and she took her money out of

the proceeds, when they came West to this State, nine years previous. That before leaving the East her husband got her money $750, brought it out here, and deposited it with Mr. Obley for safe keeping. It appears from the statement that this money was used by her husband at all times whenever he wanted it to purchase stock, or agricultural implements for his farm, and traded and disposed of what was purchased, as he saw fit without any interference or objection on her part. She permitted him to deal with the property in every respect as if he was the absolute owner of it. And if, as she says, the property as well as the increase of it, and whatever was procured by means of the original investment, was by a secret understanding between them to be hers, then she certainly was placing him in a false attitude, by clothing him with such an appearance of ownership as would enable him to obtain a fraudulent credit upon an unreal capital. During all these years her husband owned and cultivated the land upon which they resided, and, in the meantime, it is said, that the stock and farming implements procured, were purchased with her money, and, as the result of her capital, were her sole property.

If anything was sold, it was replaced with the proceeds, and by way of substitution became hers. Such an arrangement entered into by strangers would only be binding between the parties. But when this sort of an understanding is had between husband and wife; when the husband owns the farm, and uses and controls the personal property upon it, and the wife, by her silence, consents to such use and disposition, then after the husband has obtained credit upon the strength of being in possession, and the ostensible owner of the property, for the wife to turn around and claim that he had been using her money, with the private agreement between them that whatever might come into his hands should be considered her property, would be a fraud upon his creditors, and against the policy of the law, which is opposed to the possession of personal property being in one person, while the ownership is in that of another; as was said in Henry et al. v. R. I. Locomotive Works, 3 Otto, 664.

That a married woman may employ her husband to act for her as agent in the use and control of her property without any

prejudice to her right to it, is indisputably correct. But this must be done in good faith, and in the usual way that a principal manages his business through an agent. Here there was no pretense of any agency on the part of the husband to manage the affairs of the wife, and the money furnished by her to him, if any, should be treated, in respect to his creditors, according to the rule established in Brownell v. Dixon, 37 Ill. 198, and Wortman v. Price, 47 Id. 22, and adopted by this court in Guill et al. v. Hanney, decided at the December term, 1877, as a loan by the wife for the purpose of affording her husband additional aid in prosecuting his business.

It may be remarked, that among other irreconcilable statements of Mrs. Shoaf, is, that while she insists that her money paid for the property in controversy, she says, on cross-examination, that Mr. Shoaf sold hogs that were raised on the place, to get money to pay for the reaper; that he bought the wagon with hogs; got the grain-seeder with hogs; procured the fanning-mill with hogs; purchased the cows with hogs; bought the corn-plows with hogs; got the drag, and also, the bob-sled with hogs; so, that almost all of the articles in dispute were procured by Mr. Shoaf with hogs raised on the place owned and cultivated by him. The testimony of the two sons of Mrs. Shoaf, who speak in the same flippant manner, that the property in question was purchased with their mother's money, has not been overlooked. They appear quite ready to declare that it was hers, but confess their total inability to tell, when, how, and by whom, the purchase was made and paid for. Jacob does, indeed, say that the seeder and fanning-mill were "got of Mr. Cornelius," and that his mother paid for them. John testified that his mother got the money out of her trunk to buy the corn-plow. What became of it, and who she paid it to, he fails to give any information of. Now, what does Mr. Cornelius (who had no interest in the matter) say about Mrs. Shoaf paying for the seeder and fanning-mill. He swears that the seeder and fanning-mill, together with several other articles, were sold by him to Frederick Shoaf, and that Shoaf gave his note for the property; that Mrs. Shoaf was not present at the time.

Charles Wales also states that he sold Mr. Shoaf a McCormick reaper and mower, who settled for it by giving his note. So, the witness Hents testified that he sold Shoaf a wagon, and a corn-plow, and that Shoaf agreed to pay for them in wood, only two cords of which was ever delivered. Still, Mrs. Shoaf and her two sons are quite positive that her money paid for these articles.

Barton Messler says that he sold Shoaf a lumber wagon for $80, and took Shoaf's note for it. If there is a particle of evidence in this whole record to show where a dollar of Mrs. Shoaf's money went to purchase any of the articles in controversy, we have been unable to find it. Her own conduct in respect to the property, previous to the present controversy, was so inconsistent with the claim of ownership now set up, as of itself to render that claim of little or no effect. John C. Spears testified that about a year before the execution of the mortgage by Mrs. Shoaf to the appellee, he being on intimate terms with the family, went to borrow a wagon of Mrs. Shoaf, who refused to lend it, remarking to him that it did not belong to her, and that he must wait the return of Mr. Shoaf, which he did, and after Shoaf came in, talking over the matter, he stated that all the things belonged to him, and for that reason his wife did not lend them. Soon after Shoaf had left the country with his debts unprovided for, the appellee went to Mrs. Shoaf to see what could be done to secure his claim. She proposed to give him a lien upon the property, and they went together to Frank Dyslin, a justice of the peace, when appellee asked the justice to draw up a mortgage, saying that Shoaf was owing him, and had run away, that he wanted to get a lien upon the property "before the creditors got it."

The justice told him that he did not think Mrs. Shoaf could execute a valid mortgage upon Mr. Shoaf's property. Appellee then said: "draw it up, and if it was not legal, there would be nothing lost." No claim was then made that the property belonged to Mrs. Shoaf, although she was present during the conversation, and intimated nothing of the kind.

P. S. Newcomb swears that when the constable went to levy

his attachments, Mrs. Shoaf informed them that Obley had a chattel mortgage on the property, and he asked her what right she had to give this mortgage. She replied that "when the husband went away, the next had a right to dispose of it." To the same effect was her testimony before Justice Mastin on a former trial, and it is quite evident that the idea of claiming the articles in question as her sole property never occurred to her until it had been ascertained that she possessed no legal authority to mortgage the property of her husband, even though he had left the State and abandoned his family. We think the court erred in not awarding a new trial.

The judgment is therefore reversed and the cause remanded.

Judgment reversed.